The next case today is 23-1286 Lawrence General Hospital v. Continental Casualty Company. Will Attorney for Appellant, Attorney Martinez, please come up and introduce yourself for the record. Good morning, Your Honors. May it please the Court, Roman Martinez for Lawrence General Hospital. With your permission, I'd like to reserve three minutes for rebuttal. Okay, you may. Your Honors, under normal pleading standards, LGH has stated a claim under both forms of coverage at issue in this case. The District Court made two mistakes in concluding otherwise. First, it failed to recognize that LGH had properly pled physical damage to its property. There's no blanket rule against finding coverage for COVID. Instead, Verveen, Legal Seafoods, and SAS all require closely comparing the allegations in the complaint to the Massachusetts test for physical damage. Here, LGH satisfied that test. It pled that COVID, number one, physically altered its property, and number two, required remediation far beyond simple cleaning to restore the property to its safe and ordinary use. Indeed, the policy here at JA-161 expressly contemplates that communicable disease can cause physical damage in just this way. And second, LGH's decontamination order claim is even more clear-cut. In a series of COVID orders, Massachusetts shut down LGH's normal operations and required decontamination of its facilities before reopening. This sort of disease-targeted order is precisely what this coverage is for, as Continental told the Second Circuit just a few months ago. So the disease contamination claim should proceed as well. And what you're suggesting is this case should not have been dismissed on 12B6, or at least there should have been discovery or move further, correct? Absolutely, Your Honor. This is a straightforward case under the pleading standards where, of course, the court needs to accept the allegations in the complaint as true and just measure those allegations up against the Massachusetts test for physical damage. And I think that Massachusetts test has two prongs to it, as set forth in Verveen, as later applied by SAS and Legal Seafoods. Essentially, you have to allege some sort of distinct, demonstrable physical alteration to the property, number one, and then number two, you need to allege that that physical alteration was meaningful, caused damage, required remediation beyond simple cleaning to restore the property to its normal intended use. We will allege both of those things. With respect to physical alteration, we have an esteemed professor from MIT with 40 years of experience teaching chemistry at MIT, publishing 300-plus papers, a member of the U.S. National Academy of Sciences, who has set forth in his expert report, which is incorporated in our complaint, the simple point that the COVID virus causes physical alteration to property when it lands on property and bonds, chemically bonds, to that property. That's physical alteration, just like, and it's physical alteration that creates... So by dismissing the complaint, are you saying that the district court judge then basically discarded that expert testimony? That's exactly right, Your Honor. I think what the district court did, and I think what Continental is inviting you to do, is essentially apply some sort of rule that as a matter of law, as a matter of fact, which doesn't make any sense at the pleading stage, that COVID doesn't change property. And maybe that's a sense, a kind of colloquial sense or the understanding of the man on the street as to how COVID operates, but that's actually not how COVID operates. And we have an MIT professor who's an expert in this field who has laid out at great length how COVID actually interacts with physical surfaces in establishing... Counselor, can I ask you a question? I'm just wondering if your case depends a lot on the meaning of the word quickly. So in the Ravine decision, the Massachusetts highest court said that effervescent presence of a harmful airborne substance that will quickly dissipate on its own is not enough. Right. So I know you've alleged that COVID can, or the virus can stay on surfaces inside, indoors for up to 28 days and still cause illness. So is this really about whether giving you all inferences in your favor and assuming it's 28 days, whether 28 days is not quick? I think if we couldn't satisfy the even-essence test or the quickly test, I think we wouldn't have established physical damage. And I think we can establish that based on the 28 days. Two main things I want to highlight. First of all, the whole purpose of the even-essence test... Because you agree it will dissipate eventually, right? It will dissipate eventually. But we agree that we have to think about what is the even-essence test trying to get at? Just like, why is it there? And the reason it's there is it's trying to figure out whether the damage, the physical alteration is actually meaningful in like a practical sense. If it's de minimis or if it just goes away quickly, then who cares? It doesn't matter. Here though, when you've got COVID that's physically adhered, adsorbed to property for 28 days, it's enormously dangerous. It's infectious. That's why the government issued these orders requiring these facilities to be shut down. So just as a matter of thinking about the policies as a matter of common sense, 28 days when you're talking about infected property and COVID is a big deal. And then number two, we have the precedent. Because Verveen said, Verveen didn't need to get into this because it said that there was no physical effects that had been alleged at all. But when you get to Legal Seafoods and SAS, they dealt with the claim that two versions of the claim. One was dealing with the air and the other was dealing to attachment to property. We're making that second type of claim. And with respect to that, in both cases, the courts basically, this court basically acknowledged that 28 days of COVID would not be evanescent. And that's why it looked to the second prong of the test in those cases, which is whether the plaintiffs in those cases had alleged that it was so bad that it required remediation beyond simple cleaning. Right. So we would have to find, and just be patient, we'd have to find that as a matter of law, 28 days is not too quick. And second, that the amount of cleaning that you did was not simple cleaning. I think, right. Those two things we'd have to say, you don't fail on them as a matter of law, so you should have been allowed to go forward. Is that right? Exactly. Taking all the inferences in our favor and taking the allegations in the complaint is true. And I think with respect to, you know, again, we think legal grounds, the legal basis for concluding that 28 days is not evanescent is pretty clear, we think, from the SAS and legal seafood decisions. But even if we didn't have those decisions, I think if you just understood what that evanescence thing was trying to get at, it would be clear that this is the kind of physical damage that at least gets you past that first prong. And what are your best allegations that this was beyond simple cleaning in the sense of intensity rather than frequency? Is it that you had to bring in other staff or that you had to use other chemicals? I'm just wondering what you're pointing to. Three buckets of remediation that go beyond simple cleaning. They're laid out at pages 52 to 55 of the joint appendix. But just to summarize quickly, number one, enhanced cleaning protocols. We had to use stronger and more powerful detergents. We had to use them more frequently. We had to use them, it was more expensive and it was more time consuming. So along each of those dimensions, we had to go above and beyond the baseline level of simple ordinary cleaning, which at a hospital is already quite high. We had to go well beyond that. So that's just the disinfection protocols that are much more intense and go beyond simple cleaning. Second, we had to clean new surfaces and address damage to different locations that we wouldn't ordinarily have had to clean. And in particular, the HVAC systems, enormously important. HVAC systems had to be addressed in a way that they had never had to be addressed before. And we couldn't rely on our normal janitors to do the cleaning. We had to bring in outside remedial services from architects, engineers, contractors. Exactly the kind of outside services that were deemed to qualify as remediation in cases like Gregory Packaging, which dealt with the ammonia, and Matzner, which dealt with carbon monoxide. And then the third bucket of more than simple cleaning, this is a different type of remediation, we actually had to get rid of, throw out, dispose of a whole bunch of property. IV therapy poles, linens, food, toilet paper, other types of medical equipment. And so each of those three buckets independently suffices to show that we had to do remediation beyond simple cleaning. And taken together, I think it's very powerful. And the key thing legally, this goes well beyond what was alleged in legal seafoods or SAS. In both of those cases, the court basically said, okay, you can get past the first prong, the physical alteration prong, but where are your allegations of remediation? And in both of those cases, no remediation was alleged. And legal seafoods, the closest they came was they said, well, we've got to clean more frequently. And the court said, no, no, no, that's not good enough. We've got well beyond that here. Final thing I'll say on this first point, because I do want to talk about the other form of coverage. And let me just ask you one question. The other cases that legal seafoods don't deal with hospitals, here you were dealing with a hospital. Doesn't a hospital, at least under the allegations, it's probably the highest standard at all. That's where you're taking sick people during this whole period. I think that fact helps us because we've actually... You probably have to remediate more than in other places, correct? Yeah, but we actually think the baseline of cleaning, the ordinary cleaning in a hospital is already very high, but we're not relying on that. We're saying that even though we're a hospital, even though we normally have to clean a lot, when COVID, I mean, we all remember what COVID was like at the beginning, right? We had people in hazmat suits walking around hospitals. And so in the hospital, even though the level of cleanliness is very high before COVID, we had to go well above and beyond that. We were throwing out equipment. We were doing things to the HVAC systems that we never had to do before. And we were doing this super enhanced remediation and cleaning. That's what I'm saying. That's cleaning that in probably no other place had to take place. In hospitals, you're going beyond what you normally do. That's even higher than most places. Exactly. And we're happy to take the baseline as what we were doing before. We're just saying we went beyond even that kind of simple hospital cleaning. The last thing I just want to say about this policy, because we've talked about the precedent, we've talked about the standard, is I think the policy itself shows in a very clear way JA-161, which is the healthcare endorsement, which we're going to talk about in our second claim in a second. But that policy expressly contemplates that communicable disease is going to be able to create physical damage to property. Because it says that when you have a decontamination order that is prompted by an outbreak of communicable disease, one of the things that you can recover for is physical damage to the property. And as my friends on the other side acknowledge at pages 20 to 21 of their brief, a decontamination order itself doesn't inflict damage. So obviously what the policy is talking about is damage inflicted by the communicable disease. And if that's true, then it just undermines this whole argument that the other side has, which is that, oh, it's just a disease. It can never damage property and you can't get to physical damage. Counsel, has any case actually gotten to the merits and found in favor of the argument that you're making? I know there were some cases you cited that allowed cases to proceed beyond the pleading stage, but has any court on the merits? I'm not aware of any case, as I stand here right now, that's gotten all the way to the merits. A lot of the cases have been denied because the policyholders in those cases were making legal arguments that are far broader than what we're making here. Or they had factual allegations. I understand your facts are different. I was just curious. Yeah, I'm not aware of that, Your Honor. And so, unless there are other questions with respect to the all risks coverage for physical damage, I would like to talk about the decontamination order issue, which I think is even more clear-cut in our favor. Go ahead. So with respect to that, Your Honor, there is a health care endorsement that Continental specifically marketed to hospitals. And it's designed for hospitals, medical facilities, that sort of thing. And the whole idea of the health care endorsement here, the coverage that we're invoking, is that if you have a communicable disease outbreak, and if the government orders a hospital to decontaminate its facilities as a result of that communicable disease, then you're covered. And you're covered whether you have physical loss or damage. But even if you don't have physical loss or damage, you can get business interruption losses if the government essentially says, hospitals, you've got to decontaminate. You've got to shut down so that you can decontaminate. And so here, in our case, we have the Massachusetts Public Health Authorities that in May and June of 2020 issued orders that said, first in March they said, you have to shut down essentially totally. Then they sort of said, here's how you can reopen. And those orders mandated us to do decontamination in order to reopen, to do ordinary things, bread and butter type procedures that hospitals do. Colonoscopies, organ transplants, cancer surgeries, hysterectomy surgeries, contraceptive implants, prenatal care, pediatric immunizations, hip and knee replacements, all the kinds of bread and butter things that our hospital and hospitals across the country do every day, we were not allowed to do because the government ordered us that in order to reopen to do those things, we had to decontaminate. And that is a decontamination order under any sensible definition of the term. Now, my friend on the other side has argued in this brief, and I just do not understand this argument, that really this was not mandatory. It's not a decontamination order because we had a choice. That's like saying if I walk outside and a mugger comes up to my face and sticks a gun in my face and says, give me your money or I'll shoot, that that's not a mandatory order to give me my money because technically I have a choice. I could just be shot. That's not what this coverage was intended to cover. That would render the coverage completely illusory. And if you look, and I would welcome, my friend on the other side told the Second Circuit a couple of months ago when he was getting cross-examined at oral argument about this exact provision, he was asked, well, what would it cover? And he said it would cover, well, if you've got Legionnaire's disease in the HVAC system and you've got to remediate that, then that would be a paradigmatic example of coverage. Okay, we don't have Legionnaire's disease. We've got COVID, but essentially everything else is the same. And so why is this any different? I do not understand that. This is an argument that's being made here that's intended to deny coverage that we paid a lot of money for and that our hospital and our facilities, when we were in the front lines of COVID in the early days, trying to take care of people, this is exactly what we planned for by buying insurance. Our insurance companies should be held up, they should be forced to fulfill their end of the bargain. Thank you, counsel. We would ask you to reverse. Let's hear then from counsel Shanmugam. Hope I pronounced it well. You did, thank you, Judge Helpe, and I hope I pronounced that right as well. You did as well. Canon Shanmugam of Paul Weiss for Appley Continental Casualty. May it please the court. This case is the latest in a series of cases that present the question of whether claims seeking to recover business losses from the COVID-19 pandemic fall within the scope of provisions commonly found in property insurance policies. This court and the Massachusetts Supreme Judicial Court have now dealt with that question four times in cases involving materially identical policy language. Lawrence General essentially argues that it has successfully amended its complaint to plead around those cases, but it has not. I will start with the provisions requiring direct physical loss of or damage to property. Our fundamental submission here is that taking all of the allegations as true as one must at the Rule 12b-6 stage, including the incorporated allegations of the expert, that those allegations are simply legally insufficient. And I think my friend Mr. Martinez's colloquy with Judge Rickleman illustrates why. At bottom, what Lawrence General is attempting to argue here is that in Verveen, the Massachusetts Supreme Judicial Court essentially drew a distinction between simple cleaning on the one hand and more extensive cleaning on the other. To be sure, there are the references in the opinion to evanescence. But Lawrence General here concedes that its theory is not that by virtue of the fact that COVID-19 was in the air, there is direct physical loss or damage. Instead, the theory has to do with the presence of COVID-19 on surfaces. And Mr. Martinez pointed to the expert's references to the fact that COVID-19 is somehow adsorbed on surfaces and therefore that more extensive cleaning was required. In our view, that simply places too much weight on the use of the adjective simple in Verveen and essentially reads that opinion like a statute and reads that as the talismanic factor. I think quite to the contrary, the fair reading of Verveen, and I think this is consistent with how courts around the country have construed identical language, draws a distinction between on the one hand, cleaning in a circumstance in which there is no physical alteration to property as a result. And on the other hand, cases where you have to engage in rebuilding or repair. And if you take a look at Verveen, it points to the fact that there is language in the policy that in the words of Verveen clearly implies that there is no physical damage unless there needs to be active repair or remediation measures. And so to give an example that I think hopefully puts some meat on the bones of this distinction, let's say that you have mold. I think we all know from probably some degree of personal experience that you can have mold that is simply present on a surface. Say, if you're in your refrigerator and you see some mold, you can obviously remove that through simple cleaning, use of a wipe or something like that. On the other end of the spectrum, you can have more extensive damage from mold. You can have a situation in which mold causes wood rot. Suppose you have a piece of wood that has been rotted out as a result of mold. You might have to replace, say, a surface entirely if that takes place. Now this is not a perfect example for insurance coverage purposes because insurance policies often have specific provisions pertaining to mold, but I think it illustrates the conceptual distinction between these two things. And when you take- Council, can I ask you because that part of the ravine that you're talking about, the evanescent presence and the simple cleaning, it's all part of one sentence. So I know we've been looking at it clause by clause, but it seems that, again, a practical understanding of what the court was saying there was that if you've got something in the air that's gonna dissipate on its own, so you don't have to do anything, it's gonna dissipate quickly, you don't have physical damage. And even if you have surface-level contamination, if all you have to do is something relatively de minimis, like simple cleaning, you don't have damage. But what the plaintiffs have alleged here, of course, is that it didn't dissipate quickly. It could stay for up to 28 days. And the cleaning that they had to do was substantially above simple. It wasn't a wipe, which is the example that you just gave. So why isn't that enough under Verveen? So I don't think that either of those things were the sort of dispositive facts to the court in Verveen. And let me sort of explain why I think that's true. I think, first of all, Verveen did cite the cases involving pollution, cases involving things like ammonia or the smell of the meth lab that had previously been on an adjoining premise. And I think at bottom, all of those cases, as we explained in our brief, are cases where the pollution would have been permanent, absent some form of intervention. Now, it gets a little bit complicated because in some of these cases- But is it truly permanent, counsel? I mean, wouldn't the ammonia have eventually dissipated maybe years from now? Again, it just seems to me that it depends on what you mean by quickly. Yeah. Because how many things are truly permanent? Well, I would add that those are also cases, if you look at the cases themselves, and Verveen, to be fair, just sort of cited these cases in passing. These are all cases in which the pollution in question rendered the property uninhabitable. But I really understand my friend to be essentially saying that that's not really their theory here. Again, their theory really is a theory of surface contamination. And I think that at bottom, what they are trying to do is to draw a very fine legal line between more frequent cleaning on the one hand and more intense cleaning on the other. And after all, they have to do that because this court in legal seafood said that more frequent cleaning is not enough. Now, even to the extent that there are a handful of outlying cases around the country that have permitted claims to go forward, I'm not aware of any court that has drawn that distinction. And it's not entirely clear to me exactly where that distinction would fall. Are there any cases that you know that involve hospitals? So there have been cases involving hospitals, including most recently the Connecticut children's case in which we purportedly made some concession about the disease contamination provision, which I'll get to in a minute, which the Second Circuit had no trouble on materially identical facts in disposing of the claims in an unpublished opinion. And I would note that if anything, I think that the hospital context cuts in our favor with regard to the disease contamination provision, which I will get to at the court's leave, because I think that it just underscores that that is probably the context in which the repeated reintroduction of COVID-19 is most likely, because after all, during the pandemic, that was precisely where people went to get treatment for COVID-19. We don't rely on that in any sort of material sense on the legal analysis here, particularly with regard to direct physical loss or damage. And Judge Rickleman, one other thing I would say on the issue that we've been discussing is that I think that the problem with this distinction between sort of on the one hand, simple cleaning, on the other hand, intense cleaning, whichever of these facts tips you over into that category is that it sort of, it misapprehends what the focus is here, which is on the property itself. The one definition that courts seem to agree on is that physical damage unambiguously requires some, quote, distinct demonstrable physical alteration of the property. And whether you just have to use a wipe or whether you have to scrub the property more aggressively I think is of no moment, because the focus here is on the property. The focus is on whether or not there has been physical damage. So counsel, is it then your position that the property has to be not usable? Because again, we have to take all the facts in the light most favorable to the plaintiff. And I'm obviously not an expert on remediation efforts, but remediating ammonia may not be that much different from what counsel described to us they needed to do during the pandemic. So is it more your position that the property has to be uninhabitable completely? I think when you look at the cases involving pollution, that that has been a through line in those cases, that the property has been uninhabitable. And of course- Was that true in the carpet case? I- People were there, they were just getting headaches. They were getting headaches. And I think that that, I think it's fairly similar, which is to say that people could not ordinarily be present in the property. And of course, we know that these hospitals remained open. They remained open for certain purposes. And to be sure, the hospitals were taking precautions as were all open facilities. But isn't that their argument exactly, is that they, just like the carpet, which people could be there, but they were risking headaches and other harm. People could be at the hospital, but only if the hospital took these very intense efforts to remediate. But I think Judge Rickleman that that takes me back to the point that I made a little while earlier, which is that that misapprehends the fact that the focus here is on direct physical loss of, or damage to property. The focus here is on the property itself and what has happened to the property. And I think everyone recognizes that even if you have something that is present on the surface, even if it is forming non-covalent chemical bonds, I think my friend Mr. Martinez would concede that if you could just use a wipe to eliminate the virus, that that would entail the conclusion that there has been no direct physical loss of energy. That's true, but they're saying they needed much more than a wipe. Well, and I think that the problem with that is that again, the focus should be on the property itself. And I think that the mold example really drives that home because in the case in which you have wood rot, there is no form of cleaning that is going to be sufficient to solve the problem. You've got to replace the surface or replace the item entirely. The analysis you're making that it requires, it's factual issues. And wouldn't this require some discovery or there's an expert opinion, you're basically giving us another expert opinion. Isn't that enough to take this into at least a discovery stage and eventual summary judgment stage where of course you may ultimately prevail as well? I think our ultimate argument here is about where the legal line should be drawn, Judge Halpe. And so our fundamental submission is that drawing the line between simple cleaning and more extensive cleaning is insufficient. And I think if this court were to have any doubt about that, it could ask the Massachusetts Supreme Judicial Court. I was going to ask you that question. Is this a case that perhaps we should certify? I think you could. I think I would have a fair degree of confidence based on what the court said in Verveen that that is not where the court would draw the line. But if this is really a dispute about where the court drew the legal line, then sure, this court could ask the Massachusetts SJC. The fact that in legal seafoods, the court rejected the argument that more frequent cleaning was sufficient, I think suggests that this court was willing to read the Massachusetts SJC's opinion at least that far. But I think if the court had any doubt and thought that there was some distinction between more frequent cleaning on the one hand and more intense cleaning on the other, then sure, this court could ask that question. Counsel, could I move you to the second issue? I was hoping you would do that, Judge Rickleman. Can you please elaborate on your argument that these orders from DPH were optional? Because I have to be honest and say I'm finding it hard to understand that argument. And can I just read you some language from the order? So the order that I'm looking at is May 18th, 2020 order. It's JA-233. Happy to give you a minute to get there. But in this order, DPH is specifying what needs to be done for healthcare centers to resume some limited elective procedures. And it says very clearly, this is in the middle of the first paragraph, this memorandum outlines the conditions that must be met and the procedures that must be followed prior to a healthcare provider resuming limited elective procedures. And then in the next paragraph, talks about the requirement that providers attest that they have met these procedures. So how is this optional? Sure, so I think there are two prongs to our argument, as you will be aware. And one of them goes to sort of the nature of the documents themselves. The other goes to what is actually contained in the documents. I think that there's no doubt that what both of these memoranda are doing and they are styled memoranda, is among other things, setting out certain conditions that have to be met, they are mandatory, in order for certain procedures to be performed. But what the policy requires is a decontamination order. And our fundamental submission with regard to what that means is that there has to be an order that requires or mandates decontamination of the facility. And by decontamination, what we mean is complete elimination under the definitions that Mr. Martinez cites, the elimination or the ridding of the alleged contaminant. So our submission here is that with regard to the order piece of this. How can that be though in a situation where you're a healthcare provider? Because even Legionnaire's disease, your famous concession, co-counsel's famous concession, that could come back too. You might have to decontaminate again. Any virus can come back, any bacteria can come back. Why is the fact that by its very nature, because harmful viruses or bacteria can always return, why does that preclude coverage? So let's say you have an outbreak of Legionnaire's disease and this was the famous purported concession. I think what a public health authority would do in that context is it would issue something that is a decontamination order. It would say in order to reopen this property, you must eliminate Legionnaire's disease, you would presumably be required to certify that Legionnaire's disease is no longer present. And so the mere prospect that it could come back in the future is not the dispositive consideration in our view. What's different here is this is different in two respects. The first is that of course the hospital remains open. These are conditions in order to use the hospital for certain purposes. And that's why this is a memorandum. This is not a style. But it's conditions to use the hospital for its normal purposes, which is that it provides a range of services. And if a business, some other business were told by a regulatory agency, you have to comply with these procedures, which include essentially decontaminating and intensive cleaning, in order to provide 50% of the services that your business normally provides. How could that be optional and how could that? Because it's not an order to decontaminate the property. It is simply a condition for using the property for certain services. And I grant that they're ordinary services, but I think that that is what makes us different from the purported concession. Now the hypothetical on page 21 of the reply brief. Counsel, would you define decontaminate for me again? Just, I want to make sure I've got it. As you're using the word. And that goes to our second point, which is that if you take the definition that my friend uses, decontamination means to eliminate or be rid of a particular contaminant. And I think with regard to that, and again, I'm happy to focus on the terms of the memoranda. At most, the memoranda contemplated the adoption of disinfection measures. It did not contemplate the complete elimination of COVID-19. And Judge Rickleman, that's where the likelihood, indeed the certainty of reintroduction comes into play here. When you read these memoranda as a whole, and Judge Gorton, I think, did this with some care as his order reflects, what these memoranda contain, including in the incorporated guidance, is simply a variety of measures designed to reduce the risk of COVID-19 infections. All the measures with which we're all familiar, social distancing, and the like. Part of that, to be sure, is disinfecting measures. But there was never any suggestion that COVID-19 could be eliminated in the way that you would if it were an actual order to decontaminate, in the Legionnaires' disease hypothetical. Presumably what a public health authority would require is a showing that Legionnaires' disease had been eliminated. But does that mean you can never be ordered to decontaminate an airborne virus? I mean, is it limited to bacteria? I'm just struggling to understand what that means. I suppose that you could have an order. It would have been an impossible order to satisfy that required a hospital to show or to require the public health authority to determine that COVID-19 in fact was no longer present on the premises. That would be a decontamination order like the Legionnaires' disease hypothetical. But we all know that that was an impossible outcome during the COVID-19 outbreak. And the complaint in this case concedes as much when it talks repeatedly about the constant reintroduction of COVID-19 at what after all was a hospital treating people who had COVID-19. So you're saying that on its face, this provision only applies where it is physically possible to fully decontaminate? Well, I think that that is correct, which is to say that in this circumstance where the order by its terms did not require that. And indeed, this was not an order. It was not denominated as an order. It was a memorandum. It was really two memorandums on which my friend primarily relies. Both of which incorporated guidance that said there are a variety of things that you should do and you have to comply with this guidance in order to perform certain procedures, one of which was disinfection. So I think that's a far cry from the sort of decontamination order that you would have in the case of a condition like Legionnaires' disease that would render premises uninhabitable. Doesn't that suggest that you just could never have coverage in a pandemic of an airborne virus because it's a pandemic. So it continues. And so the most that DTH could order and the most the hospital could do is to decontaminate on an ongoing basis. And so you're saying that's just never going to be enough. No, I think that there could be a circumstance in which you would be able to satisfy that. I just think that given the nature of the COVID-19 outbreak and given that it was so pervasively present, it may very well be that it would be impossible to do that. And the public health authorities were not requiring that. I mean, I think that that's really the critical point. And I think that the insight that Judge Gordon had, which is that I think that in this circumstance, these documents, again, look nothing like orders. These documents are memoranda that provide, again, guidance that incorporate guidelines. And to be sure, these hospitals, again, were allowed to remain open throughout this period. And I think that that's one thing that is very different from a more paradigmatic condition. Mr. Counsel, if a regulatory agency tells one of your business clients that it must comply with certain requirements and then attests that it has actually complied, you don't take that as an order? I would take that as a requirement in order to do certain things. Again, I think with regard to a decontamination order, our fundamental submission, and I think that this was the Second Circuit's sort of basic insight, was that you have to allege, quote, that a specific government order required plaintiff to decontaminate its property. Again, there was no requirement here. It was not a condition for the property to remain open. It was simply a condition to perform additional services. And so, for instance- Where in the policy is the remaining open condition? I think that is the necessary implication, Judge Howard, if you look at JA-161, of a decontamination order at a covered location. And I would give another example that might- Before you do that, are we not allowed to take into consideration as we examine the motion to dismiss standards, that the truth, the background of tertiary care, acute care, hospitals, and the policy decisions that go into, we need the hospitals to operate during the pandemic to a certain level. Are we not allowed to consider that background information? I think, Judge Howard, you can in the sense that I think it explains why these were not decontamination orders. In other words, the policy judgment that was presumably made by the Massachusetts Department of Public Health was a policy judgment that it was not going to shut down these facilities and order them to decontaminate, that it was going to take a more modest course for the obvious reason that, as you say, we really needed these hospitals to remain open. There was a balance that public health officials were obviously- I don't mean to belabor the point, but I'm going to. So where I'm getting confused, I think, is I'm not sure if you're focusing on order and whether it's the coercive or non-coercive nature of the order, or whether this really relies on the definition of decontaminate. Can you help me with that? So we make both of those points, which is to say that we think that the fact that this is a case involving conditions on providing some services distinguishes this case from, say, the hypothetical at page 21 of the reply brief, but the hypothetical doesn't address the other problem, which is that this was not an order to decontaminate. If you look at the language in the hypothetical, it's very cute in this regard, because it says it's an order to take certain measures to decontaminate the facility. We don't think that that's enough, that it actually has to be an order to decontaminate the facility, a decontamination order. And so I think that that is why these memoranda and the incorporated guidelines are insufficient. And again, I think that the only two courts of appeals who have considered this question have come out the same way as we are proposing here, and there's nothing about the allegations and the complaint with regard to this argument that make it any different. I think at bottom, if this court were to permit this claim to proceed, and I recognize the ordinary appellate instinct to think, well, we're on a Rule 12b6 motion here, this can be resolved at a later stage. I think the court would necessarily be saying that allegations of this variety are sufficient. And I think given the entire absence of authority on the appellate level for that proposition, this court would be creating nationwide consternation for no good reason. And so we would ask that the district court's decision to dismiss be affirmed. Thank you, counsel. Any further questions? Okay, you have your rebuttal. And before the three-minute start, address at some point, I asked co-counsel, opposing counsel, the issue of certification to the Massachusetts JCCC, so if you could, in a 10-second, let us know what your view would be as to that. Sure, Your Honor, thank you. Just on that point, we filed this case in Massachusetts State Court. The other side removed it. They wanted you all to hear the case. We think it's appropriate for you all to hear the case. We think the precedent in Verveen, legal seafoods, and SAS is clear and favors us. We don't think there's a need for certification. Of course, if you wanted to confirm that, I would defer to whatever you all want to do, but we don't think that's necessary. I think I'd like to address both types of coverage here. First of all, with respect to the all risks coverage based on physical damage, my friend on the other side's principal attack on our position is that we're reading Verveen too closely. Guilty as charged, Your Honor. Verveen repeatedly uses the phrase simple cleaning. This Court's decisions in legal seafoods and in SAS repeatedly pick up on Verveen's use of the simple cleaning phrasing. That is the test that Massachusetts law has created. If you have any doubt about that, I think the clearest example, although again, the term is used throughout all three opinions. Legal seafoods at page 35 says that physical presence of COVID on the property is not enough, quote, precisely because, and then one of the two things that it says, precisely because, it could not be addressed, the alteration of property could be addressed there with simple cleaning. So it's clearly part of the test under Massachusetts law. My friend on the other side says that we can only satisfy the second prong if we establish rebuilding or repair. No, remediation is clearly a way to address the second aspect of the test. If you look at Verveen, you look at the Gregory packaging case, you look at the other case that we cited, the Mastner case involving carbon monoxide, all of those involved remediation efforts. The carbon monoxide case in particular and the ammonia case involved bringing in outside experts to adjust a chimney or to sort of do enhanced remediation. That's exactly the kind of allegation that we have here, especially with respect to the HVAC system. Verveen recognized that disposal of property would count. Disposal of property is the third bucket that we talked about earlier. So that's clearly sufficient. My friend on the other side says we're making this fake distinction between frequency and intensity. He essentially accuses us of making that up. That's exactly the distinction that the legal seafoods case made out and relied on on page 36 of that opinion. He also says that there's some sort of requirement that the property be uninhabitable, but that doesn't work either. The cases that Verveen itself cited and that are in this court's case law, the carpet odor case, Essex, the meth odor case, none of those turn on the property being uninhabitable. And finally, and the same thing is true with respect to my friend's argument, that the property itself has to be the focus of the remediation as opposed to remediating in order to prevent harm to people who are inhabiting or using that property. That's not true either. The ammonia case, the carpet odor case, both of those cases deal with the fact that you're remediating property damage in order to prevent discomfort or harm to people. So for all those reasons, I think we're good on the first claim. If I could just take one minute, Your Honor, if that's okay, on the disease contamination. One minute. So first of all, we think that the other side's argument rests on a highly, highly implausible provision, interpretation of this healthcare endorsement that was marketed to hospitals to cover exactly this kind of coverage. If you think this is a close question, you should apply the ambiguity canon, which requires that insurance policies be construed in our favor, but we don't think this is a close question at all. My friend on the other side, I think, conceded away his primary argument against us because he said, when he was revising his Legionnaire's disease example, he said, if the order said, in order to reopen, you must eliminate Legionnaire's disease, he said that that would count. That undermines the primary argument they've made against us, which is that as long as you have a choice and as long as you don't have to reopen, then it wouldn't be a mandatory order. So that argument falls away. His other arguments all depend on reading new language into the policy, into the endorsement, that aren't there. Policy doesn't require a total shutdown. The policy doesn't require that decontamination be somehow 100% complete. And it would never be 100% complete. Even as to Legionnaire's disease, Legionnaire's disease can come back. So these are efforts to rewrite the policies. Final thing I'll say, your honors, he cites two cases with respect to these orders, from the Second Circuit, the Connecticut Children's case, there's also the PS Business case. In both of those cases, the policyholders did not identify specific orders that were issued that actually required decontamination. We've identified that in spades. So for all these reasons, your honor, we respectfully ask you to uphold the party's bargain and let this case proceed past the pleading stage. Thank you. Thank you, your honor. Your excuse.